

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Reyes Merrero Rosado<br>Ismael Marrero Rosado<br><br>        Recurridos<br><br>              v.<br><br>Ramón Marrero Rosado<br><br>        Peticionario | Certiorari<br><br>2010 TSPR 35<br><br>178 DPR \_\_\_\_ |

Número del Caso: CC-2008-562

Fecha: 10 de marzo de 2010

Tribunal de Apelaciones:

        Región Judicial de Bayamón Panel VII

Jueza Ponente:

        Hon. Gretchen I. Coll Marti

Abogados de la Parte Peticionaria:

                Lcdo. Luis Cabrera Medina
                Lcdo. Wigberto Lugo Mender

Abogado de la Parte Recurrida:

                Lcdo. George Otero Calero

Materia: Acción Civil y Disolución de Sociedad

Este documento constituye un documento oficial del   Tribunal Supremo que está sujeto a los cambios y correccione  s del proceso de compilación y publicación oficial de las decisio  nes del Tribunal. Su distribución electrónica se hace como   un servicio público a la comunidad.

?

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Reyes Marrero Rosado
Ismael Marrero Rosado

    Recurridos

       v.                    CC-2008-562   Certiorari

Ramón Marrero Rosado

    Peticionario

Opinión del Tribunal emitida por el Juez Presidente señor HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 10 de marzo de 2010.

Nos corresponde determinar qué efecto tiene la confirmación de un plan de reorganización bajo el Capítulo 11 del Código de Quiebras, 11 U.S.C. secs. 1101-1174 (Capítulo 11), sobre un pleito pendiente ante nuestros tribunales cuando la continuación de dicho pleito fue autorizada por la Corte de Quiebras. Por entender que en este caso el contenido del plan de reorganización constituye impedimento colateral por sentencia en cuanto a la cuantía adeudada, revocamos la sentencia recurrida. Asimismo, revocamos la imposición del interés legal por temeridad.

I.

En 1981 los hermanos Reyes, Ramón, Rafael y Daniel Marrero Rosado crearon, mediante pacto verbal, una sociedad que denominaron "La Ceibeña", con el objetivo de operar una panadería con el mismo nombre. Posteriormente, en 1986 suscribieron un contrato de arrendamiento de un local ubicado en el Municipio de Vega Baja y allí abrieron otra panadería, "La Nueva Ceibeña". Luego de varios años salieron de la sociedad Rafael y Daniel Marrero Rosado y entraron, no como propietarios sino como socios de ganancias y pérdidas, los señores Ismael Marrero Rosado y Raúl Marrero Nazario, quienes también son miembros de la familia. A mediados de los noventa la panadería "La Ceibeña" cerró, por lo que el único negocio de la sociedad era la panadería "La Nueva Ceibeña". Ésta era administrada por el señor Ramón Marrero Rosado y los demás socios pasaron a trabajar allí.

En junio de 1998, los señores Reyes e Ismael Marrero Rosado interpusieron una demanda en el Tribunal de Primera Instancia, Sala de Bayamón, en contra del señor Ramón Marrero Rosado. Adujeron que éste no les había satisfecho las cuantías correspondientes a sus participaciones en las ganancias de la sociedad desde 1995 y que les debía a cada uno $221,832. Por su parte, el señor Ramón Marrero Rosado reconvino y alegó que la sociedad había quedado disuelta en marzo de 1998, al concluir el contrato de arrendamiento del local donde ubicaba "La Nueva Ceibeña". Adujo, además, que

lo único que quedaba pendiente era la liquidación de la referida sociedad.

Así las cosas, el señor Ramón Marrero Rosado presentó una petición voluntaria de reorganización bajo el Capítulo 11. La interposición de dicha petición de quiebra tuvo el efecto, en virtud de la paralización automática (*automatic stay*), de detener los procedimientos ante el foro estatal. Poco tiempo después, el señor Ramón Marrero Rosado instó una acción ante la Corte de Quiebras (*adversary proceeding*) contra los señores Reyes e Ismael Marrero Rosado y Raúl Marrero Nazario. Éste alegó que los allí demandados interferían con las operaciones de su negocio y solicitó una orden de entredicho permanente. Por su parte, los demandados en dicho pleito reconvinieron y adujeron que la solicitud de reorganización presentada por el señor Ramón Marrero Rosado respondía al propósito de privarlos de sus derechos en la partición de la sociedad.

Luego de varios incidentes procesales y de que ambas partes presentaran mociones de sentencia sumaria, la Corte de Quiebras emitió una orden en febrero de 2000. En ella, denegó las respectivas mociones de sentencia sumaria por entender que existía una controversia de hechos relativa a si la sociedad había sido disuelta conforme a las disposiciones del Código Civil de Puerto Rico. En lo pertinente, en la orden se dispuso:

> [T]he parties disagree, and the record fails to demonstrate, whether or not the partnership was appropriately dissolved under the Puerto Rico Civil Code. It is not clear whether the

> business, for which the partnership was
> constituted, ended….
> …In the interest of judicial economy and there
> being material issues of fact in controversy in
> the record before the Court, the Court finds
> that the Bayamón Court is in a better position
> to resolve the matter.
> For the foregoing reasons, the parties´ motion
> for summary judgment will be denied. The Court
> will lift the automatic stay and allow the
> defendants to proceed with the state court
> action. The Court will hold in abeyance the
> defendant´s motion to dismiss and the debtor´s
> opposition in the legal case until this matter
> is resolved in state court.

Luego de que la Corte de Quiebras emitiera la referida orden, los procedimientos en el Tribunal de Primera Instancia se reactivaron y continuaron de forma simultánea al procedimiento de quiebra. En abril de 2001, el foro federal aprobó el plan de reorganización sometido por el señor Ramón Marrero Rosado sin oposición de los señores Reyes e Ismael Marrero Rosado y Raúl Marrero Nazario, a pesar de que éstos fueron notificados de las distintas etapas del procedimiento. Dicha orden advino final y firme en mayo de 2001.

El plan de reorganización aprobado estableció que los señores Reyes e Ismael Marrero Rosado y Raúl Marrero Nazario eran "*contingent and disputed unsecured creditors*" y se calculó, para efectos del plan, que el monto agregado de sus reclamaciones era $30,000. En lo pertinente a la controversia ante nos, el plan de reorganización establece:

> Reyes Marrero Rosado, Ismael Marrero Rosado
> and Raúl Marrero Nazario have been listed in
> debtor´s schedules as contingent and disputed
> unsecured creditors of the herein estate. These
> parties have not filed any proof of claim in
> this case and these remain as unliquidated

amounts as of this date. Considering the ongoing litigation process ordered by the Honorable Court the claim liquidation of these parties would unduly delay the closing of the herein case. Pursuant to 11 U.S.C. Section 502(c), debtor estimates for purposes of potential allowance for debt under this class the aggregate amount of $30,000 for all creditors.

Meses más tarde, la Corte de Quiebras emitió la sentencia final (*Final Decree*) disponiendo definitivamente del caso. Mediante la referida sentencia la Corte de Quiebras ordenó el relevo de todas las deudas descargables, excepto lo dispuesto en el plan de reorganización, y puso fin a los demás asuntos ante su consideración, ordenando así el archivo del caso.

Dos años después de que concluyeran los procedimientos en la Corte de Quiebras, el señor Ramón Marrero Rosado presentó ante el Tribunal de Primera Instancia una moción de sentencia sumaria y, en la alternativa, solicitó que se desestimara la demanda en su contra. Adujo que la controversia se había tornado académica, o era cosa juzgada, pues la Corte de Quiebras había dispuesto que su obligación con los demandantes quedó extinguida y que sólo tenía que pagarles la cantidad dispuesta en el plan de reorganización. El foro de instancia denegó dicha moción.

Inconforme, el señor Ramón Marrero Rosado acudió al Tribunal de Apelaciones. El referido foro resolvió que la Corte de Quiebras dejó sin efecto la paralización automática para que el tribunal estatal determinara si la sociedad había quedado disuelta y si procedía su liquidación. Según la resolución emitida por el Tribunal de

Apelaciones, lo establecido en el plan de reorganización constituiría una defensa de cosa juzgada o impedimento colateral sólo si el foro primario encontraba que la sociedad había sido disuelta. En vista de ello, denegó el auto y los procedimientos continuaron ante el Tribunal de Primera Instancia.

Posteriormente, el 28 de febrero de 2007, el Tribunal de Primera Instancia determinó mediante resolución que la sociedad había quedado disuelta por mutuo acuerdo entre los socios en marzo de 1998, cuando finalizó el contrato de arrendamiento del local donde radicaba "La Nueva Ceibeña". En su resolución, el foro primario dispuso que se dictaría la sentencia final una vez se recibiera el informe de la contable designada por el tribunal para determinar las cantidades adeudadas por el señor Ramón Marrero Rosado a cada socio en la liquidación de la sociedad. Luego de ello, el tribunal acogió el referido informe pericial y dictó sentencia final en agosto de 2007. En ésta, el tribunal condenó al señor Ramón Marrero Rosado al pago de $118,772 a favor del señor Reyes Marrero Rosado y de $49,417 a favor del señor Ismael Marrero Rosado. Además, le condenó al pago del interés legal sobre las referidas cantidades desde la fecha de la interposición de la demanda.

Inconforme con dicha sentencia, el señor Ramón Marrero Rosado acudió al Tribunal de Apelaciones y alegó que el foro primario erró al emitir una sentencia a pesar de que, a su juicio, la controversia se había tornado académica, o

aplicaba la doctrina de cosa juzgada o de impedimento colateral por sentencia. Adujo también que se le violó su derecho al debido proceso de ley al haberse admitido el informe de la contable a pesar de sus objeciones. Por último, arguyó que el Tribunal de Primera Instancia erró al condenarlo al pago del interés legal desde la interposición de la demanda porque estaba protegido por la paralización automática, al menos hasta la conclusión de los procedimientos de quiebra y que, en todo caso, no proceden porque la cantidad dispuesta en el plan de reorganización es el máximo que viene obligado a pagar.

El Tribunal de Apelaciones confirmó la sentencia recurrida. En cuanto a los argumentos de academicidad, cosa juzgada e impedimento colateral, estimó que no procedían porque la Corte de Quiebras cedió por completo su jurisdicción al foro estatal, por lo que ninguna controversia al respecto fue adjudicada en ambos foros. El foro apelativo intermedio entendió, además, que el señor Ramón Marrero Rosado tuvo la oportunidad de contrainterrogar a la contable y que el informe sometido por ésta fue mesurado y ponderado. Por último, determinó que la imposición del interés legal desde la interposición de la demanda procedía porque el Tribunal de Primera Instancia tiene la discreción de imponerlos si estima que una parte fue temeraria.

De dicha determinación adversa acude ante nos el señor Ramón Marrero Rosado mediante recurso de *certiorari* y

esgrime, en esencia, los mismos argumentos que esbozó ante el Tribunal de Apelaciones. Examinado el recurso, acordamos expedir. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.[1]

## II.

La sociedad civil se define en nuestro Código Civil como una institución que surge del contrato celebrado por dos o más personas con el propósito de poner en común dinero, bienes o industria con el ánimo de repartirse los frutos obtenidos. Art. 1556 del Código Civil, 31 L.P.R.A. sec. 4311. El concepto de sociedad está fundamentado en tres elementos: la pluralidad de sujetos que generan una personalidad jurídica distinta e independiente de los que la forman, la existencia de un patrimonio común y la finalidad lucrativa. J.A. Cuevas Segarra y A. Román García, Los Contratos Especiales (Puerto Rico y España), San Juan, Publicaciones JTS, 1998, pág. 206. Al nacer a raíz del perfeccionamiento de un contrato, la sociedad civil es producto de la convención y en ella se manifiesta el llamado *affectio societatis* o unión de varias personas hacia un mismo fin de lucro. Marcial v. Tomé, 144 D.P.R. 522 (1997). El contrato que da lugar a la sociedad puede

---

[1] Al igual que lo hizo ante el Tribunal de Apelaciones, el señor Ramón Marrero Rosado arguye que se le violó su derecho al debido proceso de ley al admitirse el informe de la perito a pesar de su oposición. Sin embargo, este señalamiento de error carece de mérito, pues surge del expediente ante nuestra consideración que el peticionario tuvo la oportunidad de contrainterrogar a la perito. En este sentido, coincidimos con la determinación del Tribunal de Apelaciones sobre este asunto.

celebrarse por escrito o verbalmente, excepto que será necesario otorgar una escritura pública si se aportan bienes inmuebles. Art. 1558 del Código Civil, 31 L.P.R.A. sec. 1558. Además, las sociedades civiles pueden revestir diversas formas, dependiendo de lo pactado por los socios. Arts. 1561 y 1569 del Código Civil, 31 L.P.R.A. secs. 4316, 4324.

Por otro lado, a menos que no se haya convenido otro momento para el inicio de la sociedad, éste coincide con el instante en que se perfecciona el contrato entre los socios. Art. 1570 del Código Civil, 31 L.P.R.A. sec. 4341. Así pues, la sociedad puede durar: (1) por el periodo pactado; (2) por el periodo que dure el negocio que haya constituido el único objeto de ésta, si por su naturaleza lo tiene; y (3) salvo contadas excepciones, durante la vida de los socios. Art. 1571 del Código Civil, 31 L.P.R.A. sec. 4342.

Por su parte, el Art. 1591 del Código Civil establece que la sociedad se extingue: (1) cuando expira el término pactado; (2) cuando se pierde la cosa que le sirve de objeto; (3) cuando finaliza el negocio que le sirve de objeto; (4) cuando muere un socio; (5) cuando un socio adviene insolvente; (6) cuando un acreedor de un socio embarga su participación en la sociedad; (7) cuando un socio anuncia de buena fe y oportunamente su voluntad de que así sea si no se fijó un término para la duración de la sociedad y éste no resulta de la naturaleza del negocio; y

(8) cuando un socio de una sociedad constituida a un término fijo, mediante contrato o por su naturaleza, tiene, a juicio de los tribunales, justa causa para pedir la disolución. Arts. 1596, 1598 y 1700 del Código Civil, 31 L.P.R.A. secs. 4391, 4396 y 4398.

A su vez, la disolución de una sociedad por extinción produce su muerte jurídica. Paz Vda. De Barletta v. Registrador, 43 D.P.R. 870, 872 (1832). Una vez ello ocurre, comienza un periodo transicional durante el cual se han de liquidar los negocios. La liquidación consiste en aquellas operaciones dirigidas a consumar los contratos pendientes a través de las operaciones de pago de deudas y cobro de acreencias, con el fin de determinar el haber social partible. J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed., Barcelona, Bosch, 1982, II-II, págs. 519-520. El Código Civil dispone, además, que la partición entre los socios se debe llevar a cabo de acuerdo a las normas que rigen la partición de los caudales hereditarios, tanto en su forma como por las obligaciones que generan, aunque ello no excluye los acuerdos que los socios estimen convenientes. Art. 1599 del Código Civil, 31 L.P.R.A. sec. 4399; J.A. Cuevas Segarra y A. Román García, op. cit., pág. 223.

Considerados los preceptos aplicables a la sociedad civil, examinemos la normativa que rige los procedimientos de quiebra.

III.

Los procedimientos de quiebra son regulados exclusivamente por el Congreso de los Estados Unidos en virtud del Artículo 1, Sec. 8 de la Constitución de los Estados Unidos, L.P.R.A., Tomo 1, ed. 2008, pág. 167. Éste establece que el Congreso tiene la facultad "para establecer leyes uniformes de quiebras para toda la Nación". *Íd.* En virtud del citado texto, la legislación de quiebras federal constituye campo ocupado para los estados, por lo que éstos no pueden legislar en contravención a lo allí dispuesto. En específico, los procedimientos ante las Cortes de Quiebras federales, tribunales creados exclusivamente para llevarlos, se rigen por el Código de Quiebras.[2] 11 U.S.C. sec. 101 *et seq.*

La paralización automática es una de las protecciones más básicas que el legislador estadounidense instituyó en el Código de Quiebras para los deudores que se acogen a éste. Soares v. Brockton Credit Union, 107 F.3d 969, 975 (1er Cir. 1997). Ésta impide, entre otras cosas, el comienzo o la continuación de cualquier proceso judicial, administrativo o de otra índole que fue o pudo haber sido interpuesto en contra del deudor, o para ejercitar cualquier acción cuyo derecho nació antes de que se iniciara la quiebra. 11 U.S.C. sec. 362. Puede también impedir la ejecución de una sentencia previa o detener la

---

[2] Las Cortes de Quiebra son unidades de la Corte de Distrito en virtud de 28 U.S.C. sec. 151, por lo que sus sentencias se consideran sentencias de la corte de distrito federal correspondiente.

creación, perfección o ejecución de un gravamen anterior a la interposición de la quiebra. *Íd.* Sus efectos se manifiestan desde que se presenta la petición de quiebra hasta que recae la sentencia final, y no se requiere una notificación formal para que surta efecto. Jamo v. Katahdin Fed. Credit Union, 283 F.3d 392, 398 (1er Cir. 2002). Provoca también que los tribunales estatales queden privados de jurisdicción automáticamente, e incluso, es tan abarcadora que paraliza litigios que tienen poco o nada que ver con la situación financiera del deudor.[3] 3 Collier on Bankruptcy sec. 362.03[3] (2009).

Las Cortes de Quiebra tienen amplia discreción para poner fin, anular, modificar o condicionar, a solicitud de parte o *motu proprio*, los efectos de la paralización automática por alguna de las causas enumeradas en el Código de Quiebras. 11 U.S.C. sec. 362. Dicha discreción debe ejercerse siempre de acuerdo a las circunstancias del caso particular. 3 Collier on Bankruptcy sec. 362.07[1] (2009). Así, por ejemplo, una Corte de Quiebras puede poner fin a la paralización automática para permitir que un litigio continúe en otro foro, particularmente si involucra multiplicidad de partes, si está listo para juicio o si es

---

[3] Aunque somos conscientes de que las Sentencias emitidas por este Tribunal no constituyen precedente, reconocemos que en Morales v. Clínica Femenina de Puerto Rico, 135 D.P.R. 810, 819-820 n.5 (1994)(Sentencia), hicimos nuestras las expresiones contenidas en *La Paralización Automática de la Ley de Quiebras*, Instituto de Estudios Judiciales, 1993, pág. 11, a los efectos de que la mera presentación de una solicitud de quiebra provoca que nuestros tribunales pierdan jurisdicción.

lo más prudente en atención al aspecto de economía judicial. 3 Collier on Bankruptcy sec. 362.07[3][a] (2009). También puede hacerlo si considera que otro foro es el más apropiado para dilucidar una controversia particular. *Íd.*

Asimismo, una Corte de Quiebras puede modificar una paralización automática para permitir que ciertos aspectos de una controversia se diluciden en otro foro y a la vez retener jurisdicción sobre otros aspectos de la controversia. Por ejemplo, una Corte de Quiebras puede modificar la paralización automática para que algún ángulo de una controversia se dilucide en un foro estatal y, a la misma vez, disponer que retiene jurisdicción sobre la forma en que el vencedor podrá dirigirse en contra del deudor para ejecutar su sentencia. Véase John's Insulation v. L. Addison & Assocs., 156 F.3d 101, 110 (1er Cir. 1998).

Entre los diversos procedimientos establecidos en el Código de Quiebras que dan lugar a la paralización automática se encuentra la llamada "reorganización", regulada en el Capítulo 11 de dicho cuerpo de ley. La reorganización se caracteriza por ser un procedimiento en el que los peticionarios voluntariamente buscan la protección de la Corte de Quiebras mientras reestructuran sus operaciones de negocios. El objetivo principal del Capítulo 11 es permitir que un deudor que esté enfrentando dificultades para cumplir con sus acreedores pueda impedir que éstos tomen acciones adversas en su contra mientras se reorganiza y busca la forma de continuar cumpliendo con

ellos. Para que dicho objetivo pueda llevarse a cabo, el Capítulo 11, a diferencia de otros procedimientos establecidos en el Código de Quiebras, permite que el peticionario se mantenga en control de sus bienes.[4] 11 U.S.C. sec. 1107.

Una vez se interpone la petición de quiebra, los acreedores del deudor deben someter sus reclamaciones (*proof of claim*), según dispone la sección 501 del Código de Quiebras. 11 U.S.C. sec. 501.[5] La definición de reclamación (*claim*) que ofrece el Código de Quiebras es sumamente amplia y puede incluir todo tipo de acreencias, incluyendo aquellas que puedan ser inciertas y difíciles de estimar. Colonial Sur. Co. v. Weizman, 564 F.3d 526, 529 (1er Cir. 2009). En específico, el Código de Quiebras dispone que una reclamación es "[a] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. sec. 101(5). Mediante una reclamación, una persona que tenga un crédito en contra del deudor se somete a la jurisdicción de la Corte de Quiebras y busca establecer su acreencia. Ello cumple con un propósito dual, a saber, que todos los interesados se

---

[4] En ciertas circunstancias la Corte de Quiebras puede retirar dicho privilegio y otorgar la facultad de administrar el caudal a un síndico. 11 U.S.C. sec. 1104.

[5] Está establecido que, bajo el Código de Quiebras, una reclamación y una deuda son lo mismo. Colonial Sur. Co. v. Weizman, 564 F.3d 526, 530 (1er Cir. 2009).

enteren de las reclamaciones en contra del deudor y que el acreedor en cuestión participe de la eventual distribución. 4 Collier on Bankruptcy sec. 501.0[1] (2009).

Sin embargo, el Capítulo 11 dispone que en los casos de reorganización se considera que se ha sometido una reclamación si la deuda en cuestión fue incluida por el deudor en su lista de deudas (*schedules*). 11 U.S.C. sec. 1111. La referida excepción no aplica cuando se trata de deudas descritas como ilíquidas, contingentes o en disputa. 11 U.S.C. 1111(a). Es decir, aquellos acreedores que tengan reclamaciones ilíquidas, contingentes o en disputa deben someter una reclamación para que sus intereses queden debidamente protegidos. 4 Collier on Bankruptcy sec. 501.01[2][b] (2009).

Las distintas reclamaciones que pueden existir en contra de un deudor pueden ser clasificadas en tres grandes grupos: aseguradas, no aseguradas y prioritarias. Harvey M. Lebowitz, Bankruptcy Deskbook, New York, Practicing Law Institute, 1986, pág. 16. Entre las reclamaciones no aseguradas, es decir, aquellas que, contrario a las aseguradas, no están respaldadas por un gravamen previo, se encuentran las contingentes. Como sugiere su nombre, una reclamación contingente es aquella cuya procedencia depende de un evento que no ha ocurrido al momento de comenzar la quiebra. Las reclamaciones ilíquidas, por su parte, son aquellas cuya cuantía no se puede determinar aún. El hecho de que la reclamación sea contingente o ilíquida no impide

que ésta se considere como una reclamación sujeta a lo que finalmente disponga la Corte de Quiebras. 2 Collier on Bankruptcy sec. 101.05[1] (2009).

De otra parte, la sección 502(c) del Código de Quiebras establece que aquellas reclamaciones que sean contingentes o ilíquidas deben ser estimadas, cuando liquidarlas o fijarlas retrasaría indebidamente la conclusión del procedimiento de quiebra, en detrimento de los demás acreedores o del propio deudor. 11 U.S.C. sec. 502(c). En esos casos, la referida disposición es compulsoria y la corte tiene el deber de realizar la estimación. 4 Collier on Bankruptcy sec. 502.04[2] (2009). En el caso de las quiebras bajo el Capítulo 11, la estimación de las reclamaciones contingentes o ilíquidas se realiza en el plan de reorganización de forma tal que se preserve cierta cantidad para cuando se pueda saber con certeza si la reclamación procede o para cuando sea líquida. La estimación que haga una corte de quiebras para propósitos de un plan de reorganización bajo dicha sección es final y está sujeta a los principios de cosa juzgada e impedimento colateral por sentencia, siempre que se haya observado el debido proceso de ley. 4 Collier on Bankruptcy sec. 502.04[3] (2009).

Mediante un plan de reorganización bajo el Capítulo 11 un deudor o un síndico (si fue nombrado) clasifica las reclamaciones en su contra, dispone el tratamiento que cada una recibirá y propone la forma en que el plan será

implementado. 11 U.S.C. sec. 1123. Luego de que el plan propuesto queda sometido, la Corte de Quiebras celebra una vista y, si se cumplen los requisitos dispuestos en el Código de Quiebras, lo confirma mediante orden a esos efectos. 11 U.S.C. secs. 1128, 1129. Durante la vista, una parte interesada podrá objetar el contenido del plan y argumentar su oposición de forma que quede documentada. 11 U.S.C. sec. 1128.

Una vez la Corte de Quiebras aprueba el plan de reorganización, sus disposiciones se convierten en obligatorias para el deudor y sus acreedores y, salvo ciertas excepciones, ello tiene el efecto de descargar (*discharge*) todas las reclamaciones que hayan nacido antes del comienzo de la quiebra, excepto por lo que disponga el plan. 11 U.S.C. sec. 1141. Ello, aún cuando las deudas no aparezcan en la lista de deudas, cuando el acreedor no haya sometido una reclamación o cuando no reciba nada bajo el plan. En específico, el Código de Quiebras establece que excepto por lo que se disponga en el plan o en la orden que confirma el plan, luego de que éste se confirma, toda la propiedad sujeta a él estará libre de toda carga o reclamación por parte los acreedores. 11 U.S.C. sec. 1141.

El descargue opera siempre y cuando a los acreedores se les haya dado el debido proceso de ley que garantiza la Quinta Enmienda de la Constitución de los Estados Unidos. 8 Collier on Bankruptcy sec. 1141.02 (2009). Es decir, el plan de reorganización tendrá el efecto de descargar una

deuda en particular si se le concedió al acreedor o parte interesada una oportunidad razonable de ser oído. Como regla general, se cumple con dicho requerimiento mediante la vista previa a la confirmación del plan. 8 Collier on Bankruptcy sec. 1141.02[4] (2009).

La confirmación de un plan de reorganización por parte de la Corte de Quiebras se considera una sentencia de un tribunal federal con efecto de *res judicata* federal.[6] <u>Stoll v. Gottlieb</u>, 305 U.S. 165 (1938); <u>In re Iannochino</u>, 242 F.3d 36, 41 (1er Cir. 2001). En este sentido, toda objeción al contenido de una orden final de una corte de quiebras debe hacerse antes de ésta advenir final y firme ya que, salvo ciertas excepciones que no aplican al caso ante nos, no está sujeta a ataques colaterales. <u>Travelers Indemnity v. Pearlie Bailey</u>, 129 S. Ct. 2195, 2205 (2009). Así, una parte que participó en un proceso ante la Corte de Quiebras y a quien se le concedió una oportunidad justa de ser oída no puede luego resistir la ejecución de la sentencia de la referida corte. *Íd.* pág. 2206.

Recientemente, en <u>Santiago León v. Mun. de San Juan</u>, res. el 7 de octubre de 2009, 2009 T.S.P.R. 153, reiteramos que el efecto de cosa juzgada que tiene ante nuestros tribunales una sentencia dictada por un tribunal federal de distrito cuya jurisdicción se basó en una cuestión federal se rige por las normas de *res judicata* federal. La Corte

---

[6] Según el derecho federal, el término *res judicata* es un concepto sombrilla que recoge tanto las vertientes de cosa juzgada (*issue preclusion*) como de impedimento colateral por sentencia (*claim preclusion*).

Suprema federal ha resuelto reiteradamente que una sentencia que adviene final y firme constituye *res judicata* para las partes y sus causahabientes, no sólo en cuanto a todo lo que se alegó y se admitió para sustentar o derrotar una reclamación, sino en cuanto a todo otro asunto que pudo haberse planteado a esos efectos, siempre y cuando se le haya dado a la parte una oportunidad justa de ser oída. Travelers Indemnity v. Pearlie Bailey, *supra*, pág. 2205. Esta doctrina encuentra sus fundamentos en el interés de proteger a las partes del costo y dificultad que implica tener que lidiar con múltiples litigios y los objetivos de conservar los recursos judiciales y fomentar la confianza en los procesos judiciales al minimizar la posibilidad de decisiones inconsistentes. Taylor v. Sturgell, 128 S. Ct. 2161, 2171 (2008), citando a Montana v. U.S., 440 U.S. 147 (1979).

La doctrina federal de *res judicata* tiene dos vertientes. La primera, conocida como cosa juzgada o *claim preclusion*, impide que se relitiguen causas de acción, independientemente de que el primer y el segundo pleito se basen en leyes distintas. Taylor v. Sturgell, *supra,* citando a New Hampshire v. Maine, 532 U.S. 742, 748 (2001). Ésta requiere que entre un pleito anterior y uno posterior haya: (1) identidad de partes; (2) identidad de causas de acción; y (3) una sentencia final que adjudique los méritos de las mismas controversias. Santiago León v.

Mun. de San Juan, *supra*; Coors Brewing Co. v. Mendez-Torres, 562 F.3d 3, 8 (1er Cir. 2009).

La otra vertiente de la doctrina federal de *res judicata* se conoce como *issue preclusion* o impedimento colateral por sentencia. Ésta impide que en un pleito posterior se religuen cuestiones de hecho o derecho necesarias para la adjudicación de un pleito anterior, independientemente de que haya sido por la misma causa de acción o por otra distinta siempre que sea entre las mismas partes o sus causahabientes. Taylor v. Sturgell*, supra.* Para que aplique la doctrina de impedimento colateral por sentencia es necesario que: (1) el asunto de hecho o derecho sea el mismo en ambos pleitos; (2) se haya litigado en un pleito anterior; (3) se haya determinado mediante una sentencia final; y (4) que la determinación haya sido esencial para el fallo. Coors Brewing Co. v. Mendez-Torres, *supra*.

Con estos preceptos en mente pasemos a disponer concretamente de la controversia ante nuestra consideración.

IV.

A.

Según quedó establecido ante el Tribunal de Primera Instancia, la sociedad "La Ceibeña" creada en 1981 por los hermanos Reyes, Ramón, Rafael y Daniel Marrero Rosado se disolvió el mismo día en que expiró el contrato de arrendamiento del local donde ubicaba la panadería "La

Nueva Ceibeña", es decir, el 31 de marzo de 1998. El referido foro determinó que en dicha fecha, y por acuerdo de los socios, el propósito social culminó, lo que constituye una causa de extinción de la sociedad según lo dispone el Artículo 1591 del Código Civil. Art. 1591 del Código Civil, *supra*.

Conforme a las normas expuestas anteriormente, en ese momento comenzó el proceso de liquidación en el que se suponía que la sociedad pagara sus deudas y cobrara sus créditos de forma que culminara sus negocios pendientes. Puig Brutau, op. cit. Una vez ello ocurriera, los socios se partirían el haber social restante de acuerdo a las normas relativas a las herencias o según lo consideraran conveniente. Art. 1599 del Código Civil, *supra*; J.A. Cuevas Segarra y A. Román García, op. cit. No obstante, antes de que ese proceso pudiera desarrollarse, los socios Reyes e Ismael Marrero Rosado interpusieron una demanda ante el Tribunal de Primera Instancia en contra del señor Ramón Marrero Rosado y reclamaron la liquidación y partición del haber social. Mientras dicho pleito estaba pendiente ante el foro de instancia, el señor Ramón Marrero Rosado sometió una petición de quiebra al amparo del Capítulo 11 del Código de Quiebras. Ello activó inmediatamente la paralización automática y detuvo el procedimiento ante el foro local. 11 U.S.C. sec. 362. En ese momento el referido foro perdió jurisdicción sobre el pleito y éste quedo suspendido.

Tras varios incidentes procesales y dentro de una acción (*adversary proceeding*) interpuesta por el señor Ramón Marrero Rosado en contra de los señores Reyes e Ismael Marrero Rosado, la Corte de Quiebras modificó la paralización automática. Ello, en virtud del poder que le confiere el Código de Quiebras para anular, modificar, condicionar o poner fin a una paralización automática. 11. U.S.C. 362. De una lectura cuidadosa e integral de la orden que a tales efectos emitió la Corte de Quiebras se colige que el referido foro consideró que no podría disponer de la acción interpuesta por el señor Ramón Marrero Rosado hasta tanto se determinara si la sociedad había sido disuelta conforme al Código Civil. Estimó, además, que la corte estatal sería el foro más adecuado para dilucidar la controversia en torno a si la sociedad se había disuelto y, en atención al principio de economía procesal, entendió que modificar la paralización automática era lo más recomendable. En vista de ello, la corte dispuso en su orden, "[…] the Court finds that the Bayamón Court is in a better position to resolve **the matter**." (Énfasis suplido). Es decir, lo que hizo el foro de quiebras fue modificar la paralización automática para que las partes litigaran en la corte estatal un solo aspecto de la controversia: si la sociedad se había disuelto conforme al Código Civil.

Se podría argumentar, como en efecto lo hacen los señores Reyes e Ismael Marrero Rosado, que la corte de quiebras puso fin a la paralización automática. La base de

su argumento es una oración de la orden en cuestión que dispone "[t]he Court will lift the automatic stay and allow the defendants to proceed with the state court action". Es precisamente en esta oración en la que se basó el Tribunal de Apelaciones en la sentencia recurrida para concluir que el foro federal había renunciado a su jurisdicción sobre la totalidad de la controversia. No obstante, somos del criterio que la orden debe ser leída e interpretada de forma global para que se pueda conocer completamente lo que la Corte de Quiebras dispuso. En efecto, una lectura completa de la orden deja claro que la corte sólo modificó la paralización automática y no le puso fin a ésta.

Prueba adicional de ello es que la Corte de Quiebras también dispuso claramente en su determinación que mantendría la resolución de las demás mociones ante su consideración en suspenso (*abeyance*) hasta tanto el asunto de la disolución de la sociedad se resolviera en la corte estatal. Es decir, el foro federal dispuso que retendría jurisdicción sobre los aspectos de la controversia contenidos en las distintas mociones que aún estaban pendientes ante sí. De haber puesto fin a la paralización automática y, como consecuencia, de haber renunciado a toda jurisdicción sobre la controversia, la Corte de Quiebras tampoco hubiera pospuesto la resolución de las referidas mociones ante su consideración, sino que las hubiera archivado (*terminated*) y hubiera ordenado el cierre de la

acción interpuesta en contra de los señores Reyes e Ismael Marrero Rosado.

Además de disponer que retendría jurisdicción sobre dichas mociones, el foro de quiebras incluyó en el plan de reorganización una cláusula relativa a la reclamación de los señores Reyes e Ismael Marrero Rosado. En la referida cláusula, la corte clasificó el crédito de éstos como uno contingente, en disputa, no asegurado e ilíquido. Es decir, el mismo se clasificó como un crédito cuya procedencia dependía de un hecho que aún no se había producido, cuya existencia era motivo de disputa entre los socios, que no estaba respaldado por un gravamen y cuyo monto se desconocía.

De acuerdo a la normativa del Código de Quiebras, un crédito de esa índole puede ser estimado, para propósitos de un plan de reorganización, cuando esperar a que ocurra la contingencia o cuando fijar su cuantía exacta retrasaría indebidamente el proceso de quiebras, en detrimento de los intereses del deudor y de los demás acreedores. 11 U.S.C. 502(c). En el caso de autos, así lo hizo la corte al estimar las partidas que en su día corresponderían a los señores Reyes e Ismael Marrero Rosado si el foro estatal decidía que en efecto se disolvió la sociedad. El resultado de dicha estimación quedó plasmado en la cláusula del plan de reorganización que dispone que dicha partida asciende a $30,000. De nuevo, de haber renunciado por completo a adjudicar aspecto alguno de la controversia relativa a la

sociedad, la Corte de Quiebras no hubiera incluido la referida partida en el plan de reorganización, ya que no hubiera sido necesario pasar juicio sobre el asunto.

A la luz del marco fáctico que presenta el caso de autos, es forzoso concluir que la Corte de Quiebras modificó la paralización automática para permitir que se determinara en el foro estatal si la sociedad persistía y, a su vez, retuvo jurisdicción para establecer la cantidad que se adjudicaría a los señores Reyes e Ismael Marrero Rosado en el plan de reorganización por si el foro estatal encontraba que la sociedad había sido disuelta conforme al Código Civil.

Resuelto el asunto sobre la jurisdicción que ejercieron los foros estatales y federales sobre la controversia entre los socios, pasemos a resolver el efecto que tiene el plan de reorganización sobre el caso ante nuestra consideración.

B.

La Corte de Quiebras aprobó el plan de reorganización mediante orden en abril de 2001 y éste advino final y firme en mayo del mismo año, por lo que sus cláusulas se tornaron obligatorias para el señor Ramón Marrero Rosado y para sus acreedores, incluyendo a los señores Reyes e Ismael Marrero Rosado. 11 U.S.C. sec. 1141; 8 Collier on Bankruptcy sec. 1141.02[4] (2009). Es significativo que los señores Reyes e Ismael Marrero Rosado no sometieron sus reclamaciones ante la Corte de Quiebras previo a la aprobación del plan de

reorganización. Ello a pesar de que, conforme al Capítulo 11, cuando se trate de deudas contingentes, en disputa o ilíquidas, como las que tenían los señores Reyes e Ismael Marrero Rosado, los acreedores deben someter una reclamación para proteger sus intereses. Más significativo aún es el hecho de que la Corte de Quiebras aprobó el plan de reorganización sin oposición alguna de los señores Reyes e Ismael Marrero Rosado, a pesar de que éstos tenían derecho a oponerse y a comparecer en las distintas etapas del procedimiento, incluyendo la vista de confirmación del plan. 11 U.S.C. sec. 1128. Como expresáramos anteriormente, esta vista es la oportunidad que tienen las personas con interés en el procedimiento, como lo eran los señores Reyes e Ismael Marrero Rosado, para hacer valer su derecho al debido proceso de ley al exponer y dejar constancia ante la Corte de Quiebras de sus objeciones al plan de reorganización. 8 Collier on Bankruptcy sec. 1141.02[4] (2009).

Según el derecho federal, una orden final de una Corte de Quiebras que confirma un plan de reorganización se considera como una sentencia de un tribunal federal con efecto de *res judicata*. Stoll v. Gottlieb, *supra*; In re Iannochino, *supra*. Según expresamos en Santiago León v. Mun. de San Juan, *supra*, cuando un tribunal federal cuya jurisdicción se basó en una cuestión federal dicta una sentencia, ésta tendrá ante nuestros tribunales el efecto de cosa juzgada que se le reconozca bajo el derecho

federal. Por ende, respecto a la controversia ante nuestra consideración, para determinar si la orden que confirmó el plan de reorganización tiene efecto de *res judicata*, como arguye el señor Ramón Marrero Rosado, es necesario evaluar si entre ambos procedimientos existe cosa juzgada (*claim preclusion*) o impedimento colateral por sentencia (*issue preclusion*). Entendemos que se trata de impedimento colateral por sentencia.

En este caso, ambos pleitos fueron entre las mismas partes debido a que dentro del proceso anterior de quiebra el señor Ramón Marrero Rosado, el aquí demandado, instó una acción (*adversary proceeding*) en contra de los señores Reyes e Ismael Marrero Rosado, los aquí demandantes. Éstos últimos comparecieron, alegaron y fueron notificados de todas las etapas del procedimiento de confirmación del plan de reorganización, por lo que fueron partes en los procedimientos ante la Corte de Quiebras, a pesar de no haber presentado sus reclamaciones o haber opuesto objeción a la confirmación del plan.

De otra parte, en relación al requisito de que el asunto de hecho o derecho sea el mismo en ambos pleitos, entendemos que éste se cumple, dado que la disputa entre las partes en ambos foros giró en torno a la cuantía que les corresponde a los señores Reyes e Ismael Marrero Rosado. Como expliquéramos anteriormente, la Corte de Quiebras modificó la paralización automática para permitir que las partes litigaran ante nuestros tribunales la

cuestión relativa a la disolución de la sociedad, pero retuvo jurisdicción para determinar la cuantía que el señor Ramón Marrero Rosado debía pagar una vez el foro estatal resolviera el asunto. Es precisamente respecto a este aspecto de la controversia, la cuantía, sobre la cual existe identidad entre ambos pleitos, ya que el Tribunal de Primera Instancia también pasó juicio sobre ello. Además, las partes, en específico los señores Reyes e Ismael Marrero Rosado, según indicamos anteriormente, también tuvieron una oportunidad justa de litigar y ser oídos sobre este aspecto en ambos pleitos.

Asimismo, el requisito de que el asunto se haya determinado mediante una sentencia final también se satisface, ya que existe una sentencia final que adjudicó la cuestión relativa a la cuantía adeudada por el señor Ramón Marrero Rosado. La orden del foro de quiebras que aprobó el plan de reorganización es una sentencia final y firme desde mayo de 2001. En ella la Corte de Quiebras estableció de forma clara la cuantía que estaría disponible para los señores Reyes e Ismael Marrero Rosado una vez el foro estatal decidiera. Por último, la determinación de la cuestión fue esencial para el fallo, ya que la partida adjudicada en el plan de reorganización para la eventual liquidación de la sociedad fue, junto a las demás partidas, esencial para reorganizar el caudal en quiebra y poner fin al procedimiento.

En resumen, al señor Ramón Marrero Rosado le asiste la razón en cuanto a su señalamiento de error de que la cuantía dispuesta en el plan de reorganización constituye impedimento colateral por sentencia. La orden de la Corte de Quiebras en la que se aprobó el plan de reorganización es una sentencia de un foro federal basada en una cuestión de derecho federal que advino final y firme, por lo que debemos reconocerle el efecto de *res judicata* que le otorgaría una corte federal. Al estar presentes los requisitos de dicha doctrina federal nuestros tribunales tienen el deber de reconocer sus efectos. La sentencia del foro de quiebras constituye impedimento colateral por sentencia en cuanto a la cuantía que el señor Ramón Marrero Rosado adeuda a los señores Reyes e Ismael Marrero Rosado por concepto de la liquidación de la extinta sociedad "La Ceibeña". Según el plan de reorganización dicha cantidad asciende a $30,000. Resolvemos, por otra parte, que el señor Ramón Marrero Rosado debe satisfacer esa cantidad a sus antiguos socios en la misma proporción de las cuantías dispuestas en la sentencia del Tribunal de Primera Instancia para los señores Reyes e Ismael Marrero Rosado, respectivamente. Es decir, $21,000 al señor Reyes Marrero Rosado y $9,000 al señor Ismael Marrero Rosado.

V.

Nos resta atender el señalamiento del señor Ramón Marrero Rosado de que no procede el pago del interés legal por temeridad impuesto en su contra.

Como es sabido, el inciso (b) de la Regla 44.3 de Procedimiento Civil regula el interés legal por temeridad, conocido como interés pre sentencia. Regla 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. La temeridad se define como aquella conducta que hace necesario un pleito que se pudo evitar, que lo prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables. Elba A.B.M. v. U.P.R., 125 D.P.R. 294, 329 (1990). Hemos establecido que la temeridad para propósitos de la imposición de este interés es la misma que puede acarrear la condena del pago de honorarios de abogado. *Íd.* citando a Insurance Co. of P.R. v. Tribunal Superior, 100 D.P.R. 405, 411 (1972). Ambas penalidades persiguen el mismo propósito de disuadir la litigación frívola y fomentar las transacciones mediante sanciones que compensen a la parte victoriosa los perjuicios económicos y las molestias producto de la temeridad de la otra parte. Montañez v. U.P.R., 156 D.P.R. 395, 425 (2002).

La imposición del interés legal pre sentencia es altamente discrecional y un foro apelativo sólo intervendrá con la determinación de imponerlo si se demuestra que se cometió un abuso de discreción. Elba A.B.M. v. U.P.R., *supra*, págs. 328-329. No obstante, este interés sólo se puede imponer en casos de cobro de dinero o de daños y perjuicios. Regla 44.3 de Procedimiento Civil, *supra*.

En el caso de autos, el señor Ramón Marrero Rosado alega que el Tribunal de Primera Instancia estaba vedado de

condenarle al pago del interés legal desde la interposición de la demanda, porque la cantidad máxima que viene obligado a pagar es $30,000 y el plan de reorganización nada dispone sobre el pago de intereses. Arguye, en la alternativa, que de proceder el pago de intereses éstos no pueden comprender el periodo en el que estuvo protegido por la paralización automática.

Es innecesario, sin embargo, dirimir los méritos de las referidas alegaciones, pues el tipo de controversia involucrada en este caso no se encuentra entre aquellas contempladas en las Reglas de Procedimiento Civil como susceptibles de la imposición del pago del interés legal por temeridad. Regla 44.3 de Procedimiento Civil, *supra*. Como señaláramos, este interés sólo se impone en casos de cobro de dinero o de daños y perjuicios. *Íd.* Evidentemente, el caso de autos no es de esa naturaleza, ya que luego de la orden de la Corte de Quiebras que modificó la paralización automática, la controversia se limitó a determinar si la sociedad "La Ceibeña" había sido disuelta. Por ende, revocamos la determinación del Tribunal de Apelaciones en cuanto confirma la imposición del pago del interés legal por temeridad.

VI.

Por los fundamentos antes expuestos, se revoca la sentencia recurrida y se devuelve el caso al Tribunal de Primera Instancia para que proceda conforme a lo aquí dispuesto.

Se dictará sentencia de conformidad.


                                        Federico Hernández Denton
                                             Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Reyes Marrero Rosado
Ismael Marrero Rosado

    Recurridos

       v.                       CC-2008-562   Certiorari

Ramón Marrero Rosado

    Peticionario

SENTENCIA

San Juan, Puerto Rico, a 10 de marzo de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la sentencia recurrida y se devuelve el caso al Tribunal de Primera Instancia para que proceda conforme a lo aquí dispuesto.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez concurre con el resultado sin opinión escrita. La Juez Asociada señora Fiol Matta disiente sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo